UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ERIN M. HINKLE,<br><br>Defendant. | 4:18-CR-40111-05-KES<br><br><br>REPORT AND RECOMMENDATION |

## INTRODUCTION

Defendant Erin M. Hinkle is before the court on a superseding indictment charging her with conspiracy to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1) and 846.  See Docket No. 60.  Ms. Hinkle has filed a motion to suppress certain evidence.  See Docket No. 158.  The United States ("government") resists the motion.  See Docket No. 161.  This matter was referred to this magistrate judge for holding an evidentiary hearing and recommending a disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and the October 16, 2014, standing order of the Honorable Karen E. Schreier, United States District Judge.

## FACTS

An evidentiary hearing was held on Tuesday, October 30, 2019. Ms. Hinkle was there in person along with her lawyer, Mr. Stuart Hughes.  The

government was represented by its Assistant United States Attorney,
Ms. Jennifer Mammenga. Two witnesses testified and one exhibit was received
into evidence. From this testimony and this exhibit, the court makes the
following findings of fact.

Minnesota Bureau of Criminal Apprehension (BCA) Special Agent
(SA) Michael Flanagan was involved in the investigation of the pending charges
against Ms. Hinkle. On August 1, 2018, SA Flanagan interviewed two
individuals in South Dakota concerning two persons who had been
transporting methamphetamine in Minnesota, which ended up in South
Dakota. The individuals identified by SA Flanagan's sources were Ms. Hinkle
and Anthony Laws, Jr.

The sources told SA Flanagan Mr. Laws was staying in Shoreview,
Minnesota, at a hotel. The sources also told SA Flanagan Mr. Laws was driving
a maroon Jeep. SA Flanagan sent law enforcement officers to the hotel where
they located the vehicle, and determined it was a rental. The vehicle had Texas
plates. Next, the officers contacted the rental agency in Texas to confirm the
vehicle had been rented by Mr. Laws. They obtained a California driver's
license photo of Mr. Laws and confirmed with the informing sources that the
photo matched the person from whom they had received methamphetamine.
Next, the officers placed a GPS tracker on the rented Jeep pursuant to a
warrant. The next day, the Jeep was surveilled and tracked to the Minneapolis
airport, where Mr. Laws exchanged it for a different rental vehicle.

The new rental vehicle was a Volkswagen (VW) sport utility vehicle.  A Minnesota court granted a warrant for a GPS tracking device for the VW later that same day, and also for Mr. Laws' cell phone.  The tracking device was placed on the VW on August 3, 2018.  SA Flanagan and other law enforcement officers began conducting surveillance on Mr. Laws and the VW that same day. When the VW travelled into Wisconsin, SA Flanagan advised the Wisconsin State Patrol (WSP) he had probable cause to believe Mr. Laws was driving the VW and that Mr.  Laws was involved in the distribution of methamphetamine. That afternoon, (August 3, 2018), WSP Trooper Haigh initiated a traffic stop of the VW on Interstate 94.  SA Flanagan arrived on the scene of the traffic stop very shortly after Trooper Haigh initiated the stop.

Trooper Haigh identified the driver of the vehicle as Mr. Laws, and the passenger as the defendant, Erin Hinkle.  In addition to Agent Flanagan and Trooper Haigh, also on the scene of the traffic stop were two additional WSP officers.  A drug dog, along with its WSP handler, was summoned to the scene to search the vehicle.  The dog conducted an exterior sniff of the VW and alerted to the presence of narcotics. After the alert, Mr. Laws and Ms. Hinkle were removed from the VW, handcuffed, and placed in the back seat of separate WSP patrol cars.  Ms. Hinkle testified that she thought she was under arrest at that point.

 The officers then conducted a roadside search of the VW.  The officers found drug paraphernalia in a purse inside the front passenger compartment. During this initial search, fast-moving traffic had been braking and causing a

traffic hazard on Interstate 94.  The officers did not question Mr. Laws or Ms. Hinkle while at the side of the road.

The officers decided to move the VW to a parking lot off an exit of Interstate 94, with a DEA officer driving the VW to the new location.  The search of the VW was completed in the parking lot.  Ms. Hinkle and Mr. Laws were transported to the new location in the back of separate patrol cars, both in handcuffs.  The more thorough search of the VW revealed more evidence including wire transfer receipts and four cell phones.  The officers did not tell Mr. Laws or Ms. Hinkle what they had found during the search.

 After the search was completed, the officers removed Mr. Laws' handcuffs.  SA Flanagan spoke with Mr. Laws outside the squad car, away from the other officers and Ms. Hinkle.  There is no evidence in this record that Ms. Hinkle could see or hear the conversation between Mr. Laws and SA Flanagan and she testified she did not see SA Flanagan talking to Mr. Laws. SA Flanagan told Mr. Laws he was being investigated for drug trafficking. SA Flanagan told Mr. Laws he was not under arrest, and that he was free to leave, but that he (Flanagan) would like to speak with Mr. Laws.  Mr. Laws agreed to ride with SA Flanagan in SA Flanagan's vehicle to the local (Osseo, Wisconsin) Police Department to talk with SA Flanagan.  Mr. Laws got into SA Flanagan's vehicle and rode to the Osseo Police Department, without handcuffs on, in the front seat of SA Flanagan's unmarked vehicle.

SA Flanagan testified that after the search of the VW was completed, Ms. Hinkle was allowed to return to it and sit in it.  SA Flanagan also testified

4

that after he spoke to Mr. Laws, he went to speak to Ms. Hinkle. SA Flanagan explained to Ms. Hinkle that Mr. Laws wished to speak with SA Flanagan at the Osseo Police Department about some things that had gone on in the recent days, but that she was free to leave if she wished. SA Flanagan told Ms. Hinkle she did not need to follow them to the Osseo Police Department, but she decided to follow them. Ms. Hinkle's recollection of this conversation is different.

Ms. Hinkle testified SA Flanagan did not tell her that Mr. Laws had decided to voluntarily go to the Osseo Police station to talk with SA Flanagan. She thought they were both getting arrested. Ms. Hinkle testified all SA Flanagan told her was that she could leave now in the VW if she wanted and did not have to follow them to the station, but "we will have this conversation later." She interpreted this admonition as telling her that she was not under arrest, but if she did not follow SA Flanagan to the Osseo Police Station, SA Flanagan would simply issue a warrant for her arrest at some later time. She believed this to be true because she knew she had paraphernalia in her purse. Ms. Hinkle did not, at the time SA Flanagan told her she could leave in the VW, have her cell phone or any money. Ms. Hinkle followed along behind SA Flanagan's vehicle to the Osseo Police Department, driving the VW, with two separate law enforcement vehicles following behind her.

Ms. Hinkle was not an authorized driver per the rental car agreement. Though by that time law enforcement had seized the rental agreement, there is no evidence in this record that SA Flanagan had read the agreement, or if he

had read it, had realized that Ms. Hinkle was not an authorized driver. SA Flanagan did not appear to be familiar with the rental car agreement when he testified at the evidentiary hearing.

Additionally, Ms. Hinkle testified at the evidentiary hearing that she: (1) had at the time of the traffic stop recently misplaced her drivers' license/ID; and (2) had recently had carpal tunnel surgery, making it difficult for her to drive. There is no evidence in this record that any of the officers on the scene of the traffic stop were aware of either of those two facts.

SA Flanagan testified that when they arrived at the Osseo Police station, he approached Ms. Hinkle's vehicle (which had parked next to SA Flanagan's vehicle in the Osseo Police Department lot) and told her that she did not need to stay there, and that she was free to go at any time. SA Flanagan told Ms. Hinkle that he and Mr. Laws were going to go inside the station to talk. She indicated she understood. She stayed in the vehicle. Again, Ms. Hinkle's version of the events is different. She testified that SA Flanagan merely told her to stay there, and they would come get her later. She interpreted this as an admonition that she was not supposed to leave.

Ms. Hinkle stayed in the VW while Mr. Laws went into the station to speak to SA Flanagan. While she was waiting, Ms. Hinkle needed to use the restroom. She asked an Osseo Police Department officer, who had been standing outside his squad car on the street watching her while she waited for Mr. Laws, if she could use the restroom. The officer led her into the police station, through a locked door, to an area of the station which was not

6

accessible to the public to use the restroom.  The officer waited for her, and then let her back out and back to the VW.  Ms. Hinkle estimated Mr. Laws was in the building about an hour.  She was not sure what was happening but she thought he was probably getting arrested.

When Mr. Laws was finished speaking to SA Flanagan, Ms. Hinkle testified that the door to the station opened, and SA Flanagan motioned with his finger for Ms. Hinkle to come in. SA Flanagan testified that before Ms. Hinkle entered the building, he went to her vehicle and spoke with her again told her she was not required to come in and was not required to speak with him.  Ms. Hinkle denies this, and she testified SA Flanagan did nothing more than stand at the door of the police station, motioning for her to come into the police station.  Ms. Hinkle and Mr. Laws spoke briefly, but Ms. Hinkle testified they did not speak privately.  Ms. Hinkle explained Mr. Laws simply told her "it's going to be OK" from across the driveway before Ms. Hinkle exited the VW to enter the Osseo Police Department.

Ms. Hinkle's counsel has provided the court with a transcript of Mr. Laws' interrogation.  See Docket 164-1.  Toward the end of  SA  Flanagan's interrogation of Mr. Laws, SA Flanagan gave the following instruction to Mr. Laws:

> But you got to try to put something together.  I mean you got to try to come up with something that is going to be worth our while. And I'm not going to just all of a sudden come fu\*\*ing arrest you.  But, you know, there's going to come a day and a time where we're going to have to have another discussion, you know, depending on what's going on and what you can do to help yourself out.

I want to talk to your wife briefly for a little bit.[1]  And I'll let you
talk to her real quick when we go out there with me there and just
tell her hey, you know, we're cool.  And I'll just talk to her real
quick.  And as long as she's fu**ing straight with me, fu**ing you
guys are on your way down the road.  I'm not taking your money.  I
showed you your money.

Docket 164-1, pp. 45-46.  The parties agree Mr. Laws was allowed to speak
briefly with Ms. Hinkle before Ms. Hinkle went into the station.  There is no
evidence in this record, however, that Mr. Laws told Ms. Hinkle anything other
than "it's going to be ok."

Ms. Hinkle went inside the police station to speak with SA Flanagan.  By
this time, however, none of Ms. Hinkle's personal property (her purse, her cell
phone, or any money) had been returned to her.

Ms. Hinkle's interrogation is captured on video, a copy of which has been
provided to the court as Exhibit 1.  Ms. Hinkle's counsel also provided a copy of
the video, along with a transcript of the interrogation to the court in advance of
the evidentiary hearing.  See Docket Nos. 160-1 (video) and 160-2 (transcript).
The court has both watched the video and read the transcript.

The interrogation begins with SA Flanagan and another officer escorting
Ms. Hinkle into the interview room.  Ms. Hinkle testified during the evidentiary
hearing that she was intimidated during her interrogation with SA Flanagan.
She testified she did not know where Mr. Laws was during this time, or
whether he was under arrest.

---

[1] Ms. Hinkle indicated in her interrogation with SA Flanagan that she and
Mr. Laws were husband and wife.  During her evidentiary hearing testimony,
she stated Mr. Laws was merely a long-term boyfriend.

On the video of Ms. Hinkle's interrogation, Ms. Hinkle was directed by the officers to have a seat near the door. Exhibit 1 at 16:56. SA Flanagan is seen closing the door, but then reaching back to open it again slightly. Id. Ms. Hinkle appears to look backwards toward the door when SA Flanagan cracked the door open, but it is unclear whether Ms. Hinkle was aware the door was cracked open (she testified that she heard a noise, but was unaware the door was re-opened).

SA Flanagan began the interrogation by stating they were there in "not a great" situation, and that he thought Ms. Hinkle knew why they were there. Id. Ms. Hinkle agreed with SA Flanagan's assessment. Id.

Ms. Hinkle explained that she did not have an ID because she'd misplaced hers a few months earlier. Id. That is the extent of the conversation that occurred before SA Flanagan stated, "first of all, you're free to leave at any time. You're not under arrest. We're not blocking the door. If you want to leave, you tell me, hey, I want to leave; I don't want to talk to you. So just want to make sure you understand that." Id. at 16:57. After this statement by SA Flanagan, he began questioning Ms. Hinkle, starting with asking Ms. Hinkle to state and spell her full name, and give her date of birth. Id. Throughout the remainder of the thirty-one-minute interrogation, Ms. Hinkle answered SA Flanagan's questions, including questions which elicited information which was incriminating to her and Mr. Laws.

At approximately 17:04 in Exhibit 1, SA Flanagan turned the focus of his questioning to Ms. Hinkle's cell phone. He picked it up and offered it to

Ms. Hinkle, and she touched the screen, while spontaneously stating "it's a fingerprint" as she unlocked it.  Id.  SA Flanagan asked Ms. Hinkle, "can I take a look at your phone?"  Id.  Ms. Hinkle replied, "please, please," as she opened her arms with her palms facing upward.  Id.  SA Flanagan scrolled through the phone. Id.  Ms. Hinkle asked to see some Facebook entries from the day involving her daughter.  Id.  Toward the conclusion of SA Flanagan's questioning, SA Flanagan explained he intended to keep Ms. Hinkle's cell phone.  Id. at 17:20.  He told he she should write down information she would need off her phone, such as phone numbers.  Id.  Ms. Hinkle offered SA Flanagan her passcode.   Id. at 17:21.  At the conclusion of the interrogation, SA Flanagan stated: "That's it.  There's your stuff . . . Then you guys are on your way." Id. at 17:27.

At the evidentiary hearing, SA Flanagan confirmed that the officers retained the cell phones, drug paraphernalia, and documents that were taken during the search of the VW, but that Ms. Hinkle's purse and Mr. Laws' wallet and other personal effects were returned to them.  Ms. Hinkle and Mr. Laws were released at the conclusion of Ms. Hinkle's interrogation.   Ms. Hinkle was indicted on these charges on February 5, 2019, (Docket No. 60) and arrested in Mississippi on April 1, 2019 (Docket No. 94).

## DISCUSSION

### A.    *Miranda* **Required for Custodial Statements**

"[A]n individual must be advised of the right to be free from compulsory self-incrimination, and the right to the assistance of an attorney, any time a

person is taken into custody for questioning." United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). A Miranda warning is required prior to questioning whenever two conditions are present: (1) the suspect is being interrogated and (2) the suspect is in custody. Unites States v. Flores-Sandoval, 474 F.3d 1142, 1146 (8th Cir. 2007); Griffin, 922 F.2d at 1347; United States v. Carter, 884 F.2d 368, 371 (8th Cir. 1989).

Interrogation includes direct questioning or any practice reasonably likely to evoke an incriminating response from a suspect. See Rhode Island v. Innis, 446 U.S. 291, 301 (1980). Here, neither party disputes that Ms. Hinkle was being interrogated and neither party disputes that Miranda warnings were not given prior questioning. Thus, whether Ms. Hinkle's statements should be suppressed pursuant to the rule in the Miranda case depends on whether Ms. Hinkle was in custody at the time of her interrogation.

Some courts have placed the burden of proving that the defendant was not in custody at the time of the interrogation on the government. See United States v. Charbonneau, 979 F. Supp. 1177 (S.D. Ohio 1997). Other courts have placed the initial burden on the defendant to prove that she was "in custody," with the burden of proof shifting to the government to prove a voluntary waiver only after the defendant has sustained her initial burden. See United States v. Moore, 104 F.3d 377, 391 (D.C. Cir. 1997). The Eighth Circuit appears not to have addressed this issue yet, although some district courts within the circuit have. See e.g. United States v. Morriss, 2006 WL 3519344

11

(W.D. Mo. 2006) (placing initial burden on defendant and citing to extra-circuit cases for authority). For purposes of this report and recommendation, the court has placed the burden of proving that Ms. Hinkle was *not* in custody on the government.

A suspect is considered to be "in custody" either upon his or her formal arrest or "under any other circumstances where the suspect is deprived of his" or her "freedom of action in any significant way." Griffin, 922 F.2d at 1347 (citing Berkemer v. McCarty, 468 U.S. 420, 429 (1984)). Absent formal arrest, a suspect is deemed is be "in custody" where a reasonable person in the suspect's position would have believed that his freedom of action had been curtailed to a "degree associated with formal arrest." Berkemer, 468 U.S. at 442; United States v. Black Bear, 422 F.3d 658, 661 (8th Cir. 2005); Griffin, 922 F.2d at 1347; Carter, 884 F.2d at 370. The test is one of objective reasonableness judged from the point of view of the suspect, not from the point of view of the interrogator. Berkemer, 468 U.S. at 442; Black Bear, 422 F.3d at 661; Griffin, 922 F.2d at 1347; Carter, 884 F.2d at 370. In determining whether a suspect reasonably believed himself or herself to be in custody, the court examines the totality of the circumstances. Carter, 884 F.2d at 370 (citing United States v. Lanier, 838 F.2d 281, 285 (8th Cir. 1988) (*per curiam*)).

Under the totality of the circumstances test, six nonexclusive factors have emerged with some frequency: (1) whether the suspect was informed that he was free to leave and that answering the interrogator's questions was voluntary; (2) whether the suspect possessed freedom of movement during the

12

interrogation; (3) whether the suspect initiated contact with the interrogator or voluntarily acquiesced in the interrogation; (4) whether the interrogator employed strong-arm tactics or strategies; (5) whether the atmosphere of the interrogation was dominated by the police; and (6) whether the suspect was arrested at the close of the interrogation. See Flores-Sandoval, 474 F.3d at 1146-1147 (citing Griffin, 922 F.2d at 1349). Reference to these factors is helpful, but these factors are not exclusive and custody "cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." Flores-Sandoval, 474 F.3d at 1147. In addition, the place where the interrogation took place, the purpose of the interrogation, the length of the interrogation, and other factors are also to be considered. Griffin, 922 F.2d at 1348; Carter, 884 F.2d at 370.

In United States v. Czichray, 378 F.3d 822, 827 (8th Cir. 2004), the Eighth Circuit cautioned the Griffin factors are by no means exhaustive and should not be applied "ritualistically." The Court emphasized "an express advisement that the suspect is not under arrest and that his participation is voluntary" is the most obvious and effective means of demonstrating he has not been taken into custody. Id. at 826. The Eighth Circuit regards the twin admonitions that the suspect is free to leave and does not have to answer questions to be "weighty in the custody analysis." United States v. Perrin, 659 F.3d 718, 720-21 (8th Cir. 2011). The Griffin factors still appear in Eighth Circuit case law after Czichray, and continue to be cited with approval for determining the custody issue. See id.

13

Whether a suspect was the focus of an investigation at the time the interrogation takes place is of little significance unless that fact was communicated to the suspect and that fact contributed to the suspect's reasonable conclusion of not being free to go.  Griffin, 922 F.2d at 1348; Carter, 884 F.2d at 370 (citing United States v. Jimenez, 602 F.2d 139, 145 (7th Cir. 1979)).

Courts have given substantial weight to an interrogator's advising a suspect that no arrest is being made or will be made at the time of questioning, and that the suspect is free to decline to answer questions or to terminate the interrogation at any point the suspect so chooses.  Perrin, 659 F.3d at 720-21; Griffin, 922 F.2d at 1349-1350.

The court in United States v. Johnson, 64 F.3d 1120, 1125-1126 (8th Cir. 1995), found that the suspect was not in custody even though he was questioned in the back of a patrol vehicle.  Specific factors which lead the court to its conclusion were that the suspects were specifically advised that they were not under arrest, they were not handcuffed or otherwise restrained while in the squad car, they were not isolated, their passengers remained at the scene, no strong arm tactics were employed, the questioning was straightforward, and the officer who questioned the suspects was not in uniform.

## B.    The Discrepancies Between SA Flanagan's Testimony and Ms. Hinkle's Testimony

In the FACTS section above, the court noted points in which SA Flanagan and Ms. Hinkle's version of events diverged.  Ms. Hinkle's testimony at the

evidentiary hearing also contains some inconsistencies from the answers she gave to SA Flanagan during her August 3, 2018, video-taped interrogation:

- During Ms. Hinkle's interrogation, she told SA Flanagan she and Mr. Laws were husband and wife. During the evidentiary hearing, she stated Mr. Laws was her boyfriend.

- During Ms. Hinkle's interrogation, she indicated she and Mr. Laws were traveling to Chicago for reasons related to the drug conspiracy (see Exhibit 1 at 17:06-07 and 17:16-17). During the evidentiary hearing, she stated they were going to Chicago because she wanted to "see Chicago before they went home."

These inconsistencies were not explained to the court. They are not material to the indicia of custody other than as a reflection of Ms. Hinkle's credibility. Critical to whether Ms. Hinkle was in custody in this case is whether, and how many times SA Flanagan advised her she was free to leave and was not under arrest.

SA Flanagan testified that he made this admonition to Ms. Hinkle no less than four times during the August 3, 2018, encounter: (1) at the site of the second vehicle search before the group caravanned to the Osseo Police Department with Ms. Hinkle driving the VW; (2) when the group arrived in the parking lot of the Osseo Police Department but before Mr. Laws went into the building to be interrogated; (3) again in the parking lot of the Osseo Police Department parking lot after Mr. Laws finished his interrogation but before Ms. Hinkle entered the building; and (4) in the interview room, at the start of Ms. Hinkle's interrogation.

Ms. Hinkle concedes SA Flanagan told her she could leave before she drove the VW to the Osseo Police Department. Ms. Hinkle nevertheless

testified she believed she was not free to leave and that she was in fact getting arrested because she knew paraphernalia had been found in her purse, and because SA Flanagan told her that he would "have this conversation" with her later. She claims she interpreted that statement as a threat to arrest her with a warrant if she did not drive to the Osseo Police Department. Ms. Hinkle also concedes (as she must) that SA Flanagan advised her she was not under arrest and free to leave at the beginning of the video-taped interrogation at the Osseo Police Department.

"The assessment of a witness's credibility is the province of the trial court." United States v. Coney, 456 F.3d 850, 860 (8th Cir. 2006) (assessment of witness credibility for purpose of suppression hearing). This is so even where there is conflicting testimony between the defendant and the testifying officers. United States v. Hernandez, 281 F.3d 746, 748 (8th Cir. 2002). The above-cited inconsistencies, both between Ms. Hinkle's own previous statements and with SA Flanagan's testimony, persuade this court that Ms. Hinkle's memory is faulty or that she was not completely candid with this court during the evidentiary hearing. The court therefore finds, consistent with SA Flanagan's testimony, that he admonished Ms. Hinkle four times on August 3, 2018, that she was free to leave and that she was not under arrest.

**C.   Whether Ms. Hinkle was in Custody at any Time During Her August 1, 2018, Encounter with Law Enforcement**

Ms. Hinkle asserts her entire encounter with law enforcement on August 3, 2018, beginning with the moment she and Mr. Laws were removed from the VW and placed in handcuffs, was custodial. Ms. Hinkle and Mr. Laws were

16

removed from the VW after the drug dog alerted to the presence of narcotics. They were handcuffed and placed in separate patrol cars while the officers first conducted a brief search of the VW, then moved the VW to a parking lot off the nearest exit from Interstate 94. A DEA agent drove the VW to the parking lot, with Ms. Hinkle and Mr. Laws riding, still handcuffed, in separate patrol cars.

The Supreme Court in Berkemer addressed the issue of whether a motorist who is the subject of a traffic stop is "in custody" for purposes of Miranda. Berkemer, 468 U.S. at 427. After the motorist is formally arrested on a traffic violation, no matter how minor, the Court held that Miranda warnings are required. Berkemer, 468 U.S. at 434-435. However, during the traffic stop itself and prior to arrest, the Court held that Miranda applies only when and if the "suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" Id. at 440-441 (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam)).

The Court acknowledged that a traffic stop "significantly curtails the 'freedom of action' of the driver and the passengers" in the detained vehicle, noting that drivers who see a policeman's signal neither feel free to ignore that signal nor to drive away, once stopped. Id. at 436. However, a traffic stop is generally devoid of those elements of coercion that prompted the announcement of the rule in Miranda. Id. at 436-438. For example, the detention is presumptively temporary and brief, with the driver being allowed to continue on his way after a check of his license and registration and, perhaps, the issuance of a citation. Id. at 437. Also, the interrogation takes place in

17

public, subject to observation by pedestrians and other vehicles, thus reducing the ability of an unscrupulous policeman to "use illegitimate means to elicit self-incriminating statements and diminish[ing] the motorist's fear that, if he does not cooperate, he will be subjected to abuse." Id. at 438. Thus, the Court concluded that the "noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for purposes of Miranda." Id. at 440.

The Berkemer Court directed courts to consider factors such as the following in determining whether a suspect at a traffic stop was "in custody" such that Miranda warnings were required:  period of time elapsed between the traffic stop and the arrest, whether the suspect was informed his detention was only temporary or that he was not under arrest, and the character and nature of the interaction between the police and the suspect at the stop.  Id. at 441-42.

The Eighth Circuit discussed the application of Berkemer to a traffic stop in United States v. Morse, 569 F.3d 882 (8th Cir. 2009).  In that case, police stopped the vehicle in which Morse was a passenger.  Id. at 883.  The driver was arrested for driving with a suspended license and the officer asked Morse to exit the vehicle so as to conduct a search of the vehicle incident to arrest. Id.  When Morse exited, the officer told Morse he was going to conduct a pat-down search and asked Morse if he had anything on his person the officer should know about.  Id.  At that point, Morse told the officer he had crack cocaine in his pocket.  Id.  Morse later moved to suppress his statement and

the fruits of the officer's search of his person because the interrogation by the officer was without benefit of <u>Miranda</u> warnings.  <u>Id.</u>

The district court granted the motion to suppress, declining to apply the holding of <u>Berkemer</u> because the district court held that "the questioning of [Morse] was not in connection to the reason for the stop and far exceeded a routine roadside questioning." <u>Id.</u> at 884.  The Eighth Circuit reversed, holding that <u>Berkemer</u> controlled the analysis. <u>Id.</u> at 884-85.  The court held that, under <u>Berkemer</u>, the mere fact that Morse did not feel free to leave was not determinative of whether <u>Miranda</u> warnings were required. <u>Id.</u>  In addition, the court noted that Morse was asked only a "modest number of questions" and the facts did not establish a situation tantamount to a formal arrest. <u>Id.</u>

In <u>United States v. Rodriguez</u>, 711 F.3d 928, 935 (8th Cir. 2013), the court also found the defendant was not in custody during questioning at a traffic stop.  In that case, the defendant was stopped after police observed his vehicle had no license plates and the registration had expired. <u>Id.</u> at 933.  As the police officer approached Rodriguez's car, he saw a television and speakers in the back seat. <u>Id.</u>  Rodriguez told the officer his driver's license was suspended, but gave him his date of birth. <u>Id.</u>  The vehicle was not registered either to Rodriguez or his passenger. <u>Id.</u>  The officer returned to his patrol car to run a records search, leaving the two men in Rodriguez's car. <u>Id.</u>  While seated in his patrol car, the officer saw Rodriguez and the passenger reaching for the floorboard and looking back at the officer. <u>Id.</u>  The records check

revealed the car was registered to a third party and there was a possible felony arrest warrant outstanding for Rodriguez.  Id.

Fearing for his safety, the officer called for backup.  Id.  When assistance arrived, the officers ordered Rodriguez out of his car.  Id.  The officer asked Rodriguez what he had been reaching for and Rodriguez told the officer there was a handgun in the center console.  Id.  The officer then handcuffed Rodriguez for officer safety, but told Rodriguez he was *not* under arrest.  Id. The officer then put Rodriguez into his patrol car.  Id.  The officer asked Rodriguez if there was any other contraband in his car, and Rodriguez admitted there was a methamphetamine pipe under the driver's seat.  Id.  The second officer similarly handcuffed the passenger and placed the passenger into a separate patrol car.  Id.

On appeal, Rodriguez argued he was "in custody" for purposes of Miranda as soon as the officer ordered him to exit his vehicle.  Id. at 935.  The issue of whether Rodriguez was "in custody" when he was handcuffed and seated in the back of the officer's patrol vehicle was not raised, briefed or argued on appeal.  Id. at 935 n.2.  As to the issue of whether Rodriguez was "in custody" at the moment he was ordered to exit his car, the court held he was not.  Id. at 935.  At that moment, the officer had legitimate concerns for his own safety because of the reach for the floorboards, the nature of the car was suspicious (no license plates and registered to a third party with different last name than either Rodriguez or his passenger), and there was a possible felony warrant for Rodriguez, for whom the officer had not received any form of

identification.  Id.  Under these circumstances, the court held the officer was justified under Berkemer and Terry[2] in removing Rodriguez from the car and securing him while the officer investigated further.  Id.

Given all of the circumstances in this case, the court finds Ms. Hinkle probably was in custody during the brief period that she rode in the squad car in handcuffs from the location of the first search to the location of the second search.  During that time, she had been removed from the VW, placed in handcuffs in the back of a squad car, separated from her traveling companion, and her personal belongings had been taken from her.  SA Flanagan did not testify that he or anyone else had, by then, told Ms. Hinkle she was not under arrest.  During this time frame, Ms. Hinkle's "freedom of action [was] curtailed to a 'degree associated with formal arrest.' "  Berkemer, 468 U.S. at 440-441.

But Ms. Hinkle does not assert that any interrogation occurred during this time frame.  There are no statements to suppress which were obtained during this brief custodial period.

Whether Ms. Hinkle's statement must be suppressed, however, must be decided based on the totality of the circumstances which were present not at some earlier time, but when she was interrogated.  United States v. Wallace, 323 F.3d 1109, 1113 (8th Cir. 2003).  See also Carter, 884 F.2d at 370.  And the decision is made based not on Ms. Hinkle's subjectively stated belief that she was under arrest, but on the objective determination of whether a

---

[2] Terry v. Ohio, 392 U.S. 1 (1968).  Terry authorizes a stop by police and brief investigation if there is reasonable suspicion to believe criminal activity is afoot.  Id. at 20-22, 30.

reasonable person in her position would have so believed.  Berkemer, 468 U.S. at 442; Black Bear, 422 F.3d at 661; Griffin, 922 F.2d at 1347.

"The task of defining custody is a slippery one."  United States v. Axsom, 289 F.3d 496, 500 (8th Cir. 2002).  Though it a closer question, the court concludes Ms. Hinkle was not in custody during her video-taped interrogation with SA Flanagan on August 3, 2018.  The following considerations specifically inform the court's conclusion.

First, as the court has earlier explained, SA Flanagan informed Ms. Hinkle four times before she spoke to him that she was free to leave and that she was not under arrest.

> That a person is told repeatedly that he is free to terminate an interview is powerful evidence that a reasonable person would have understood that he was free to terminate the interview.  So powerful, that no governing precedent of the Supreme Court or the Eighth Circuit holds that a person was in custody after being clearly advised of his freedom to leave or terminate questioning.

United States v. Giboney, 863 F.3d 1022, 1027-28 (8th Cir. 2017) (cleaned up).

Second, Ms. Hinkle possessed unrestrained freedom of movement during the questioning.  She was escorted into the interview room by SA Flanagan and directed to sit in the chair closest to the door.  She was not handcuffed or restrained in any other way during the questioning.  SA Flanagan closed the door, but then cracked it open again.  Ms. Hinkle asserts she did not notice this, but she never asked to leave or inquired whether the door could be opened.  She was closest to the door, and neither officer blocked her exit, should she have chosen to do so.  Immediately before the questioning began, she had been sitting outside the police station in the VW.  There is no evidence

in this record that the keys to that vehicle were taken out of her control before the questioning began.

Ms. Hinkle argues she was not a permitted driver on the rental agreement, did not have her license with her, and was physically impaired by recent carpal tunnel surgery. She alleges all of these were practical obstacles which prevented her from driving away, so a reasonable person in her position would not have felt free to leave. But none of these alleged obstacles prevented Ms. Hinkle from driving the VW *to* the Osseo Police Department, and there was nothing preventing Ms. Hinkle from contacting a friend, relative, or public transportation for purposes of finding a way to leave the Osseo Police Station. The court is also aware that by the beginning of the interrogation, Ms. Hinkle did not have possession of her purse because it had been seized during the search of the VW. The purse and its non-contraband contents were returned to her at the conclusion of the interrogation. Before the interrogation, SA Flanagan had repeatedly told Ms. Hinkle she was not under arrest and was free to leave, so there is nothing to suggest her purse and its non-contraband contents would not have been returned to her earlier had she chosen to exercise her option to leave.

Ms. Hinkle did not initiate contact with SA Flanagan. The contact was initiated by the traffic stop. Though Ms. Hinkle testified she did not subjectively believe she had a choice about whether to go to the Osseo Police Department, that is not the correct inquiry. Ms. Hinkle's handcuffs were removed after the search of the VW at the second location. Ms. Hinkle

23

returned, unrestrained, to the VW.  SA Flanagan gave her the option of following along to the Osseo Police Department or going on her way—driving the VW with nobody in the vehicle with her.  At that point, no reasonable person would have believed they were under arrest.

There is no evidence in this record that SA Flanagan or any of the other officers used strong arm tactics or deceptive stratagems during the questioning of Ms. Hinkle.  There is some indication in the transcript of Ms. Laws' interrogation that the reason given for the traffic stop upon vehicle in which Ms. Hinkle was a passenger was that the vehicle was speeding, and that this was a subterfuge.  See Docket 164-1, pp. 2-3.  But that the reason given for the traffic stop may have been a subterfuge does not render SA Flanagan's later interrogation of Ms. Hinkle strong-armed or deceptive.  To the contrary, SA Flanagan was candid with Ms. Hinkle about the reason for his questioning.  Recall that SA Flanagan began the interrogation by stating they were there in a "not great" situation, and that he thought Ms. Hinkle knew why they were there.  Exhibit 1 at 16:56.  Ms. Hinkle agreed with SA Flanagan's assessment.  Id.  That Ms. Hinkle knew she was the subject of a drug investigation is a factor which mitigates toward custody, but this factor "does not weigh heavily in the analysis."  Griffin, 922 F.2d at 1348.

Ms. Hinkle's circumstances were police dominated beginning with the traffic stop.  SA Flanagan testified there were at least three Wisconsin Highway Patrol officers (including the canine officer) present at the scene of the stop, plus SA Flanagan.  SA Flanagan and another officer were present during

24

Ms. Hinkle's interrogation, which occurred in the Osseo Police Department. That the interrogation was police dominated, however, does not automatically render the interrogation custodial. Giboney, 863 F.3d at 1027; United States v. Sanchez, 676 F.3d 627, 631-32 (8th Cir. 2012); United States v. Boslau, 632 F.3d 422, 424, 428, 429 (8th Cir. 2011).

Finally, neither Ms. Hinkle nor her traveling companion were arrested at the conclusion of their interrogations. Ms. Hinkle insisted throughout the evidentiary hearing that she believed she was under arrest throughout her encounter with law enforcement on August 3, 2018, despite SA Flanagan's admonitions to the contrary. The court carefully watched the video tape of her interrogation. Ms. Hinkle expressed no surprise when SA Flanagan told her at the end of her interrogation that she was "on [her] way." Exhibit 1 at 17:27. This is further evidence that SA Flanagan did advise Ms. Hinkle from the beginning that she was free to leave and was never under arrest.

Ms. Hinkle's freedom was curtailed to a degree associated with formal arrest only for a very short time during her handcuffed ride in the patrol car from the location of the first search of the VW to the parking lot where the second search occurred. No objectively reasonable person in Ms. Hinkle's position would have believed they were under arrest when the handcuffs were removed, she was given the keys to the VW, and SA Flanagan told her she could choose to follow along to the Osseo Police Department, or continue on her way. Even if SA Flanagan told her she could come to the Osseo Police Department or have a conversation with him at some other time, those words

25

are not equivalent to constraining Ms. Hinkle's freedom to a "degree associated with formal arrest." Berkemer, 468 U.S. at 442; Black Bear, 422 F.3d at 661 Griffin, 922 F.2d at 1347; Carter, 884 F.2d at 370.

The totality of the circumstances once Ms. Hinkle arrived at the Osseo Police Department, as explained above, lead to the conclusion that her interrogation was not custodial. Berkemer, 468 U.S. at 442; Black Bear, 422 F.3d at 661; Wallace, 323 F.3d at 1113; Griffin, 922 F.2d at 1347; Carter, 884 F.2d at 370. No Miranda warnings were required, and this court therefore recommends that Ms. Hinkle's statements should not be suppressed.

## D. Whether Ms. Hinkle's Consent to Search her Cell Phone Was Voluntary

Ms. Hinkle does not dispute that during her interrogation, she consented when SA Flanagan asked if he could look through the contents of her cell phone. But Ms. Hinkle asserts that because her consent was not voluntarily given, the information gleaned from SA Flanagan's search of the phone should be suppressed. "The government bears the burden of proving voluntary consent by a preponderance of the evidence." United States v. Bearden, 780 F.3d 887, 895 (8th Cir. 2015) (cleaned up).

A consent to search is valid if the "totality of the circumstances demonstrates that the consent was voluntary." United States v. Chaidez, 906 F.2d 377, 380 (8th Cir. 1990); Bearden, 780 F.3d at 895. Consent is voluntary if it is the product the free and unconstrained choice of its maker, rather than duress or coercion. Chaidez, 906 F.2d at 380. The totality of the circumstances which should be considered include both the characteristics of

the accused and the details of the interrogation.  Id. at 380-81; Bearden, 780
F.3d at 895.

The characteristics of the accused which should be considered are:
(1) her age; (2) her general intelligence and education; (3) whether she is
intoxicated or under the influence of drugs when consenting; (4) whether she
had been informed of her *Miranda* rights when consenting; and (5) her previous
experience with the criminal justice system.  Chaidez, 906 F.2d at 381;
Bearden, 780 F.3d at 895.

The interrogation environment circumstances which should be
considered are: (1) whether the interrogation was lengthy; (2) whether the
suspect was threatened or physically intimidated; (3) whether the suspect
relied on any promises or misrepresentations by law enforcement officers;
(4) whether the suspect was in custody or under arrest when consent was
given;  (5) whether the suspect was in a private or secluded place when consent
was given; and (6) whether he objected or stood silently by while the search
occurred.  Chaidez, 906 F.2d at 381; Bearden, 780 F.3d at 895.

Ms. Hinkle was an adult when she gave consent to search her cell phone.
She stated at the beginning of her interrogation that she was born in January,
1985, so she was 33 years old at the time of this encounter with law
enforcement.  Ms. Hinkle appears to be of at least average intelligence, and did
not appear during the interrogation to have any trouble understanding or
answering SA Flanagan's questions.  She also did not appear to be under the

influence of intoxicants. She had not been given the <u>Miranda</u> warnings. She had an extensive prior experience with the criminal justice system.[3]

Ms. Hinkle's interrogation was not lengthy; it lasted thirty-one minutes. <u>See</u> Exhibit 1. Ms. Hinkle was not threatened or physically intimidated. Though she testified that she was subjectively intimidated by SA Flanagan's large stature, SA Flanagan did nothing to foster Ms. Hinkle's subjective thoughts. SA Flanagan's interrogation style was not loud, abusive, or physically animated. He did not raise his voice or threaten Ms. Hinkle with arrest or with the arrest of her travelling companion should she fail to offer satisfactory answers. SA Flanagan made no promises or misrepresentations to Ms. Hinkle. The court has already explained why Ms. Hinkle was not in custody or under arrest at the time she gave her consent to search the phone. She did give consent while in a private or secluded place (the interview room at the Osseo Police Department). Finally, Ms. Hinkle did not object when SA Flanagan began to scroll through her phone, and she unlocked it for him with her fingerprint more than once. When he asked to look through it, she opened her palms and said "please, please" (as if to say, "please do.").

The court finds the government has borne its burden of proving by a preponderance of the evidence that Ms. Hinkle's consent to search the phone

---

[3] On cross-examination during the evidentiary hearing, counsel for the government asked Ms. Hinkle whether she had been arrested 19 times before her arrest on these charges. Ms. Hinkle never clearly affirmed or denied this number. This court independently recalls from Ms. Hinkle's detention hearing which was held on April 20, 2019, that Ms. Hinkle's prior criminal arrest history was extensive.

was not the product of duress or coercion. <u>Bearden</u>, 780 F.3d at 895. Instead, the totality of the circumstances leads to the conclusion her consent to search was the result of her unconstrained, voluntary choice. <u>Chaidez</u>, 906 F.2d at 380. <u>Bearden</u>, 780 F.3d at 895. As such, this court recommends that this portion of Ms. Hinkle's motion to suppress also be denied.

## CONCLUSION

For the reasons more fully explained above, this court recommends that Ms. Hinkle's motion to suppress statements and evidence [Docket 158] be DENIED in its entirety.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the district court. <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990); <u>Nash v. Black</u>, 781 F.2d 665 (8th Cir. 1986).

DATED November 5th, 2019.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge

29